# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOEY T. STAKEY,<br><br>        Plaintiff,<br><br>    v.<br><br>KLINT H. STANDER; DR. HADLOCK;<br>HOWARD WILLIS; TIM McHUGH;<br>DEITCHLER LANE; ROBERT<br>BALFOUR; ANDY MACHIN; TOM<br>MANWARING; LARRY HYNES;<br>COLLEEN SMITH; JAN EPP; APRIL<br>DAWSON; CORRECTIONAL<br>MEDICAL SERVICES, INC.; RANDY<br>BLADES; JOHN HARDISON; and<br>JOHANNA SMITH,<br><br>        Defendants. | Case No. 1:09-cv-00094-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

The following defendants moved for summary judgment in this case: Correctional Medical Services, Inc. (CMS), Robert Balfour, LPN, Timothy McHugh, M.D., David Hadlock, D.O., Lane Deitchler, N.P., Howard Willis, M.D., and Klint Stander, M.D. (collectively, the "CMS Defendants"). *See* Dkt. 70. Thereafter, defendants Randy Blades, John Hardison and Johanna Smith joined the CMS Defendants' motion. *See* Dkt. 71.

The Court finds that the decisional process would not be aided by oral argument, and will resolve these motions after consideration of the parties' written submissions. D. Idaho L. Civ. R. 7.1(d).

## SUMMARY JUDGMENT FACTS

Before reciting the relevant facts, the Court will address the admissibility of certain evidence, including Stakey's medical records and the CMS Defendants' admissions.

## 1. Evidentiary Issues

The CMS Defendants' motion relies heavily on Stakey's medical records. These medical records are hearsay, but may be admissible under the business records exception to the hearsay rule. *See, e.g.,United States v. Hall*, 419 F.3d 980, 987 (9th Cir. 2005) (medical records "classic" exception to the hearsay rule). That exception renders admissible records of "acts, events, conditions, opinions, or diagnoses, made at or near the time by . . . a person with knowledge," but only if such records are "kept in the course of a regularly conducted business activity, and if it was a regular practice of that business activity to make a memorandum, report, record, or data compilation." Fed. R. Evid. 803(6). Facts supporting admissibility must be supplied "by the testimony of the custodian or other qualified witness or by certification" that complies with Federal Rule of Evidence 902.

Dr. Scott Lossmann (who is not one of Stakey's treating physicians) attaches Stakey's medical records as an exhibit to his affidavit, but he does not lay the necessary foundation to invoke the business-records exception to the hearsay rule. Instead, the only foundation provided is this: "As Regional Medical Director [of CMS], I perform only administrative duties. I am personally familiar with the facts set forth herein by virtue of

my status as Regional Director for CMS." *Lossmann Aff.,* Dkt. 70-4 ¶ 1.

Nonetheless, the Court will consider the medical records because Stakey has not objected to their use and relies on many of the same records in his complaint and in opposing the motion for summary judgment. *See* Fed. R. Civ. P. 56(e)(2) (if a party fails to "properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion); *Atkinson v. Fischer*, 2009 WL 3165544, at *3 n.1 (N.D.N.Y. Sept. 25, 2009) (under similar facts, deciding summary judgment motion based upon unauthenticated prison medical records). Defendants are advised to properly authenticate medical records in future motions.

A second evidentiary issue arises because the CMS Defendants argue that Stakey cannot rely on out-of-court statements they made. As the CMS Defendants put it: "Of course, any statements that Stakey attributes to the CMS defendants . . . are hearsay and . . . inadmissible. (FRE. 801, 802)." *Reply* at 3, Dkt. 74.

This is incorrect. Stakey may testify as to what the CMS Defendants said to him because such statements are nonhearsay admissions. *See* Fed. R. Evid. 801(d)(2)(d) (admission by a party-opponent's agent concerning a matter within the scope of the agency is an out-of-court statement offered against a party). The rationale for treating these out-of-court statements as nonhearsay is as follows:

> Admissions are nonhearsay because none of the fundamental reasons for excluding hearsay applies. A party against whom an admission is offered has ample opportunity to cross-examine the testifying witness regarding the statement, and to explain or deny the purported admission. The fact the party's statement was not made under oath or in the presence of the trier of

fact is immaterial because the party is able to testify as to the circumstances under which the statement was made.

Robert E. Jones *et al.*, *Rutter Group Practice Guide: Federal Civil Trials & Evidence* ¶ 8:2027. The Court will, therefore, consider the CMS Defendants' admissions, to the extent relevant.

Otherwise, the CMS Defendants have raised some valid, general objections to Stakey's affidavit, in that certain statements are medical opinions, argument, or not based on personal knowledge. But the Court can handle these issues by reciting only those facts supported by admissible evidence. In so doing, the Court will rely on Stakey's verified complaint, to the extent statements made therein are based on personal knowledge. *See Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (verified complaint may be treated as affidavit).

## 2. Relevant Facts

With these evidentiary issues resolved, the Court turns to the facts. The short version is that Stakey injured his shoulder twice while in prison – once in the summer of 2007 and again in November 2008. He was seen by several different medical providers for his injuries, including doctors, nurses, and a physician's assistant.  These providers administered a course of treatment the CMS Defendants describe as "conservative management."  This treatment included, at various times, x-rays, prescription and non-prescription pain medications, lower-bunk memos, and an arm sling. The more specific, visit-by-visit details are set forth below.

**A. Summer 2007:  Stakey's Initial Shoulder Injury**

In late June or early July 2007, Stakey injured his right shoulder while playing soccer. *Stakey Compl. ¶* 19, Dkt. 3. That same day, Stakey submitted a health services request form (referred to by the parties as a kite) requesting a doctor appointment.[1]  He then waited for two weeks, but was not seen by a doctor. Prison staff told him to submit another medical kite, which he did on August 1, 2007. *Id. ¶* 23.

In his August 1 kite, Stakey indicated that the pain from the injury was so excruciating that he could not sleep at night and, further, that ibuprofen and aspirin were not alleviating his pain. *See Ex. A to Stakey Aff.*, Dkt. 73-7, at 1; HFOB 1.[2]

Stakey was eventually seen in mid-August 2007, when he had an appointment with nurse practitioner, Lane Deitchler. *Compl. ¶* 24.  Deitchler ordered an x-ray, mobic (a non-steroidal anti-inflammatory), and muscle balm. *Id. ¶* 26; HFOB 9, 19; *see also Ex. A to Stakey Aff.*, Dkt. 73-5, at 2.

A few weeks later, Stakey submitted another medical kite. In this one, he indicated that Mobic was not alleviating his pain, and he asked to be evaluated by a doctor. HFOB 2; *see also Ex. A. to Stakey Aff.*, Dkt. 73-5, at 2 (Stakey voices similar concerns in a September 13, 2007 IDOC offender concern form).

---

[1]  CMS disputes this point, stating that Stakey did not kite the issue until August 1, 2007. *See Lossmann Aff. ¶* 8.  The Court resolves this factual dispute – and all others – in Stakey's favor at the summary judgment stage.

[2]  All citations to "HFOB" refer to documents attached as Exhibit A to Dr. Scott Lossmann's affidavit. *See Lossmann Aff., Ex. A.*, Dkt. 70-5. These exhibits are bate stamped with the preface "HFOB."

On September 21, 2007, Dr. David Hadlock evaluated Stakey. *See id.* at 2-3. Dr. Hadlock had apparently just received the x-ray that was ordered during the August visit. *Compl.* ¶ 28. The x-ray showed a "very subtle first degree A-C [acromio-clavicular] joint separation" on the right shoulder. HFOB 40. Dr. Hadlock ordered an arm sling for Stakey, but did not prescribe any pain medication. *See Compl.* ¶ 28. Stakey indicated that when he asked for pain medication (explaining that he could not sleep or turn over in bed), Dr. Hadlock said he was an OB/GYN and was "new at this." *Id.*

Shortly after this appointment, on October 2, Stakey submitted two offender concern forms, one addressed to "Tom Manwaring HSA (CMS)" and the other to "Doctor Hadlock M.D. (C.M.S.)" *See Ex. A to Stakey Aff.*, Dkt. 75-3, at 2-3; *Compl.* ¶ 29. In both, he expressed dissatisfaction with the treatment he had received; his chief complaint was that he was still in pain. The prison responded to both forms by instructing Stakey to submit a medical kite. *Id.*

Stakey complied, submitting another medical kite on October 5, 2007. *Compl.* ¶ 30; *Ex. A to Stakey Aff.*, Dkt. 73-5, at 3, 7 and Dkt. 73-7, at 3. He stated: "I need to be scheduled to see a doctor immediately. This Mobic medication is not helping to alleviate the pain at all. Also, I still continue to have bad side effects of this Mobic as severe stomach cramps, chest pain, diarrhea, dizziness, fainting and breathing difficulties . . . ." *Ex. A to Stakey Aff.*, Dkt, 73-7, at 3. CMS indicates that it did not receive this kite. *See Lossmann Aff.* ¶ 10, Dkt. 70-4 ("Dr. Lossman notes, "I note that while Mr. Stakey was instructed to submit a Kite to obtain another evaluation, he never did so.").

Roughly three weeks later, on October 31, 2007, Stakey filed a grievance with the prison, again setting forth his problems with Mobic. *Ex. A to Stakey Aff.*, Dkt. 73-5, at 4. Stakey further stated, "I feel that somebody in C.M.S. is deliberating ripping up my medical HSR form, before it can get process[ed]." *Id.* Prison staff eventually checked a box indicating that Stakey's grievance was "denied," but the response also states: "You will be scheduled for a call out for a new x-ray of your shoulder . . . . You will also be on call-out to see an MD." *Id.*

On November 13, 2007, Stakey was evaluated for complaints of sharp pain in the right deltoid. The August x-ray was reviewed and another ordered. *See* HFOB 10 (November 13, 2007 appointment notes). The new x-ray indicated that the separation had worsened somewhat – the November x-ray reports indicates a "first degree right A-C separation" as compared to the August 2007 x-ray, which indicated a "*very subtle* first-degree separation. *Compare* HFOB 40 *with* 42 (emphasis added).

After the November visit, Stakey filed a grievance with the prison. He reiterated that he remained in severe pain and that Mobic was not helping. He also expressed frustration that CMS "ignored my two (2) HSR medical forms that I've filed in the past months." *Ex. A to Stakey Aff.*, Dkt. 73-5, at 7.

In early January 2008, Stakey "was finally scheduled to see a different doctor: Defendant Dr. Stander . . . ." *Compl.* ¶ 35. Dr. Stander determined that Stakey had strained his right deltoid muscle and injected him with kenalog. *Id.*

Dr. Stander saw Stakey for a follow-up visit on March 14, 2008. Dr. Stander noted: "On exam, I don't feel he has significant pain. He requests vicodin. I recommended against it. I offered him despramine - he declined that. I offered him Percogesic - he declined that and made fun of it. He then became argumentative and I had to ask him to leave."  HFOB 12.

According to Stakey, he did not become argumentative, but simply could not pronounce the names of the medication, as he is hearing impaired. He describes the appointment as follows:

> Dr. Stander suggested Plaintiff try a medication called Percogesic, or something of that sort. Plaintiff could not pronounce the name of the medication or fully hear what [it] was called, because of his hearing difficulties and speech impediment, which he was diagnosed with as a child. Plaintiff then asked Defendant Dr. Stander to clarify what he had said by writing the name of the medication on a piece of paper, at which time he just repeated the name of the medication. Because Plaintiff still was confused, he asked him, "Are you saying the last part of the word like Jesus on a cross?" Then Dr. Stander became very angry and visib[ly] upset; he then became abusive in tone and mannerisms by pointing his finger three (3) or four (4) inches from Plaintiff's face [at] which time he said "Now you are just being smart with me, and I don't put-up with smart alecks or wise guys like you."

*Compl.* ¶ 44.

Dr. Stander also told Stakey that he would not prescribe narcotic pain medications "because he felt Plaintiff would abuse it.  At the same time, Defendant Dr. Stander, in his response, simply told Plaintiff to 'suck-up the pain and deal with it, you are in prison what do you expect?'" *Id.* ¶ 40.

In any event, as noted above, Dr. Stander ended the appointment because he felt Stakey had become too argumentative; he ordered Stakey to leave the exam room without any pain medication. Stakey indicates that "Dr. Stander did discuss with me a couple non-narcotic medication, however these meds have already been tried and they didn't relieve the excruciating pain in my shoulders." *Id.*

After this visit, Stakey filed concern forms and pursued a formal grievance. *See Ex. A to Stakey Aff.,* Dkt. 73-5, at 10-11. Stakey's grievance was denied, as was his appeal from the denial. *Id.* at 10-11.

Nevertheless, two weeks after his appointment with Dr. Stander, Stakey saw physician assistant Delapaline. *Compl.* ¶ 53. Delapaline "re-ordered" percogesic, noting that Dr. Stander had offered it to Stakey in the March 14 visit. *Id.* ¶ 55. Stakey did not receive the prescription, however, until roughly two months later, on May 26, 2008. *Id.* A few weeks after that, the medication was discontinued because of possible side effects. *Id.* ¶ 56. Stakey submitted several concern forms, indicating his inability to obtain medication. *See* Dkt. 73-6, at 2-3 (April 16, May 12, July 18, and August 25, 2008 concern forms).

Between June 20, 2008 (when percogesic was discontinued) and November 2008 (when Stakey re-injured his shoulder), it is unclear what type of pain medication, if any, Stakey received. In the interim, Stakey rolled his ankle while playing softball, and he received treatment for that injury. HFOB 13. The notes from that appointment do not

mention Stakey's shoulder injury. *See id.*

**B. November 2008: Stakey Re-Injured his Shoulder**

On November 2, 2008, Stakey re-injured his right shoulder. As with his first injury, this one occurred while he was playing soccer. He was seen that day by nurse practitioner Robert Balfour. Balfour did not prescribe any pain medications because he understood Stakey already had ibuprofen and, further, he could not prescribe anything more because he is a nurse. Additionally, Balfour believed Stakey was already scheduled for an evaluation at the outpatient clinic the next day. *See Balfour Aff.,* Dkt. 70-3, ¶¶ 7-11.

The next morning, November 3, 2008, Stakey had an appointment with Dr. Howard Willis.[3] *Compl.* ¶ 69; HFOB 14. Dr. Willis ordered an x-ray of Stakey's right shoulder. The x-ray showed that the right AC separation had worsened since November 2007; otherwise, there was no evidence of a fracture or dislocation. Dr. Willis ordered vicodin for five days, an arm sling, a lower bunk memo, and a follow-up evaluation. HFOB 25, 37, 43.

On November 13, 2008, Stakey saw Dr. Willis for a follow-up visit. The notes indicate that Stakey was using his sling appropriately and had increased his range of motion. HFOB 14; Dkt. 73-6, at 9. Dr. Willis renewed the vicodin prescription and continued the lower bunk memo for two weeks. HFOB 14. Dr. Willis' notes also contain this entry: "will hold ortho consult for later if problems persist." *Id.* Stakey understood

---

[3] Stakey indicates that Dr. Stander was also present at this appointment. *See Compl.* ¶ 69.

that Dr. Willis was going to request approval for an orthopedic consult. *See Compl. ¶ 70* (Per Stakey, Dr. Willis stated, "'This shoulder injury is affecting your daily activities, I might have to put in a referral for you to see an orthopedic specialist at Saint Alphonsus. Don't get your hopes up, this request hardly ever gets approved by CMS director.'"); *see also Ex. A to Stakey Aff.*, Dkt. 73-6, at 9.

Shortly after the November 13 follow-up visit with Dr. Willis, Stakey was transferred to a different prison. On November 20, Stakey filled out an IDOC Receiving Screening/Inmate Questionnaire, indicating that he needed a "follow-up on my shoulder dislocation injuries," though he did not indicate that he needed to be seen immediately. HFOB 97. On this form, Stakey wrote: "I've been taking vicodin at night time after dinner. The Doctor only ordered it] for two (2) weeks. Last night I took my last dose. This medication is helping alleviate the pain in my shoulder when I am sleeping." *Id.*

On December 17, 2008 – roughly one month after the transfer – Stakey saw Dr. Timothy McHugh. Dr. McHugh's notes indicate Stakey had an exaggerated pain response when removing his clothing compared to re-dressing at the end of the examination. HFOB 14. Dr. McHugh indicated that he educated Stakey on appropriate shoulder exercises and advised him to avoid exacerbating activity. Dr. McHugh's notes also state: "This is not a surgical problem in prison." HFOB 15; see also Ex. A to Stakey Aff., Dkt. 73-6, at 9. Stakey says that Dr. McHugh told him to "hit the weight pile outside in the rec. yard and do your own therapy." *Compl. ¶ 76.*

Dr. McHugh evaluated Stakey again on January 14, 2009. Dr. McHugh diagnosed a right-shoulder impingement and prescribed a low dose of Amitriptyline (an antidepressant) and a kenalog injection. HFOB 16, 26.  Stakey received the kenalog injection two months later, on March 17.  HFOB 17.

Stakey filed his complaint in March 2009. The record is unclear as to what treatment Stakey receive after March 2009 (when Stakey received a kenalog injection). By the time Stakey filed his summary-judgment papers (in January 2011), he was working at a community work center and had seen an orthopedist at his own expense. *See Stakey Aff.,* Dkt. 73-4, ¶ 13.

## ANALYSIS

**1.     The Legal Standard Applicable to Motions for Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the outcome of the case." *Id.* at 248.

The moving party is entitled to summary judgment if that party shows that each material issue of fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assen*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence

must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine dispute as to a material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it."

**2. The Legal Standard Applicable to Stakey's Eighth Amendment Claim**

Stakey brings his lawsuit under 42 U.S.C. § 1983, contending that all defendants violated his Eighth Amendment rights. The Supreme Court has interpreted the Eighth Amendment's prohibition of cruel and unusual punishment, incorporated through the Fourteenth Amendment, as imposing a duty on states to provide medical care to prisoners. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).

To prevail on an Eighth Amendment claim based on deficient medical care, a plaintiff must satisfy a two-part test. "First, the plaintiff must show a 'serious medical need.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle*, 429 U.S. at 104). A serious medical need is defined by what happens if a particular condition is *not*

treated. If failure to treat a medical condition "could result in further significant injury or the 'unnecessary and wanton infliction of pain'" then the prisoner has demonstrated a "serious medical need. *Id.* (citation omitted).

Second, the plaintiff must show that defendants were deliberately indifferent to a serious medical need. To show such indifference, the plaintiff must show (1) the prison officials' subjective awareness of the medical need; (2) "a purposeful act or failure to respond to a prisoner's pain or possible medical need . . . ."; and (3) "harm caused by the indifference." *Id.*

Deliberate indifference "'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Id.* (citing *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). The Ninth Circuit has noted that "[d]eliberate indifference is a high legal standard." *Toguchi v. Chang*, 391 F.3d 1041, 1060 (9th Cir. 2004). Consequently, mere indifference, medical malpractice, or negligence are insufficient to state an Eighth Amendment claim. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). Additionally, a difference of medical opinion as to the need to pursue one course of treatment over another cannot establish deliberate indifference. *See, e.g., Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996). Rather, to prevail, plaintiffs must show that "the course of treatment the doctors chose was medically unacceptable under

the circumstances, and the plaintiff must show that they chose this in conscious disregard of an excessive risk to plaintiff's health." *Id.* (internal citations omitted).

In this case, it is undisputed that Stakey's condition adversely affected his daily activities (ability to sleep) and caused him pain. *See Lopez v. Smith*, 203 F.3d 1122, 1131-32 (9th Cir. 2000). Defendants motion focuses on their response to Stakey's condition. They contend that, on the undisputed facts presented here, no reasonable juror could conclude that they were deliberately indifferent to Stakey's medical needs.

## 3. Stakey's Eighth Amendment Claim

Stakey's complaints against CMS and the individuals who treated him vary somewhat, but the common theme is that they "strung him along" by: (1) delaying treatment; (2) failing to effectively treat his pain; (3) failing to order a consult with an orthopedist; and (4) failing to provide further treatment, such as physical therapy. The Court will address these arguments in turn, first as to the individuals, then as to CMS.

### A. Individual Liability

#### (1). *Nurse Deitchler*

Nurse Deitchler was not deliberately indifferent to Stakey's medical needs. He physically examined Stakey, ordered an x-ray, and prescribed mobic and a muscle balm. Although mobic later proved to be an ineffective pain reliever for Stakey, there is nothing in the record showing that Deitchler prescribed the medication knowing it would be ineffective.

### (2). *Dr. Hadlock*

Dr. Hadlock is also entitled to summary judgment. Dr. Hadlock reviewed the August x-ray results with Stakey and prescribed an arm sling. *Compl.* ¶ 28. Although Dr. Hadlock did not prescribe pain medication, the record does not reveal any purposeful failure to treat Stakey's pain. Rather, the record suggests (at most) that Dr. Hadlock was uncomfortable ordering prescription medication for shoulder pain because he was "new at this." While these facts might show that Dr. Hadlock was not the best doctor to address Stakey's needs, they do not support a finding of deliberate indifference. *Cf. Estelle*, 492 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

### (3). *Nurse Balfour*

Nurse Balfour was not deliberately indifferent to Stakey's needs. He performed a brief exam less than an hour after Stakey re-injured his shoulder in November 2008. He determined emergency care was not called for and, after determining Stakey was scheduled to see a doctor the next day, he sent Stakey back to his cell. Stakey was seen the very next day – at 8:00 a.m. – by a doctor. *Compl.* ¶ 69.

Stakey argues that Nurse Balfour made a "bad judgment call" and minimized him, telling him, "You just bruised it pretty good; no big deal." *Compl.* ¶ 62. Stakey believes he should have been immediately transferred to an emergency room, and that the delay in sending him to a doctor caused him to suffer needlessly. But even assuming Nurse

Balfour made a "bad judgment call" that is all it was. There is nothing to show that Nurse Balfour was deliberately indifferent to Stakey's medical needs.

*Higgins v. Correctional Med. Servs of Ill., Inc.*, 178 F.3d 508 (7th Cir. 1999) (en banc) – a case Stakey cites in his brief – supports this conclusion. *Higgins* concluded that the district court properly granted summary judgment against a prisoner litigant who suffered a shoulder injury in prison. *Id.* at 513-14. Among other things, the *Higgins* Court noted that Higgins' "claim is that he [the doctor] was deliberately indifferent for not doing exactly what Higgins wanted – that is to send him to a hospital to be x-rayed." *Id.* at 513. Stakey's complaint against Balfour is similar, and fails for the same reason. Prisoners are not entitled to the precise care they desire; rather, they are only entitled to treatment that is not deliberately indifferent to their serious medical needs.

### (4). *Dr. Willis*

Dr. Willis is entitled to summary judgment. He saw Stakey twice and prescribed vicodin, a sling and a lower-bunk memo. He also ordered an x-ray of Stakey's shoulder. Stakey further contends – and for purposes of this motion, the Court will assume – that Dr. Willis also sought approval from CMS for an orthopedic consult. Nothing in these facts supports a finding that Dr. Willis was deliberately indifferent to Stakey's medical needs.

### (5). *Dr. McHugh*

Dr. McHugh was not deliberately indifferent to Stakey's medical needs. Dr.

McHugh had two appointments with Stakey. Dr. McHugh did not continue the vicodin, as he did not feel narcotic pain medication was appropriate. He did order a kenalog injection on the second visit and instructed Stakey to perform his own physical therapy exercises. These facts do not support a deliberate-indifference finding.

Stakey complains that Dr. McHugh did not order an orthopedic consult; but, a prisoner "has no independent constitutional right to outside medical care supplemental to or additional to the medical care provided by the prison staff within the institution." *Amarir v. Hill*, 243 Fed. Appx. 353, 354 (9th Cir. 2007) (unpublished order, citing *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) and *Estelle*, 429 U.S. at 103-04). Further, there is nothing in the record showing that Stakey was harmed by any delay in seeing an orthopedist.[4]

Stakey also complains that Dr. McHugh believed Stakey's injury did not justify surgery. But the record shows Dr. McHugh believed any surgery would be for cosmetic purposes, and that CMS would not pay for such a surgery. *See Compl.* ¶ 74. Refusal to recommend surgery under these circumstances does not support a finding of deliberate

---

[4] Stakey saw an orthopedist at his own expense (while on work release) in August 2010. He submitted the orthopedist's notes in the opposition to his summary judgment motion. Even assuming these records were properly before the Court, they do not support a finding of deliberate indifference. The orthopedist concluded that an MRI was indicated "given the history of the shoulder dislocation and deep-seated pain." *Ex. C to Stakey Aff.*, Dkt. 73-9, at 3. He did not indicate, however, that an MRI – or any other treatment – should have been ordered earlier. Nor does he indicate that Stakey's condition deteriorated due to the lack of an earlier orthopedic consult. Nothing in the orthopedist's records indicate the type of care – or lack of care – that can amount to deliberate indifference.

indifference.

### (6). *Dr. Stander*

Dr. Stander is also entitled to summary judgment. As noted above, Dr. Stander saw Stakey on two occasions in early 2008. On the first visit, he ordered a kenalog injection for pain. During the second visit, Dr. Stander ordered Stakey to leave the appointment because he understood Stakey had turned down (and made fun of) alternative pain medications.

Viewed in the light most favorable to Stakey, the facts show that Dr. Stander was rude, abrasive, and insensitive to Stakey's hearing loss. But these facts do not support a finding that Dr. Stander provided deliberately indifferent medical care for three reasons: First, Dr. Stander did not personally believe Stakey was in "significant" pain. Second, Dr. Stander nonetheless discussed alternative forms of pain medication (percogesic) with Stakey. Third, Dr. Stander believed Stakey did not want this medication, and that Stakey made fun of it by asking whether the last part of the medication was pronounced "Jesus," like "Jesus on the cross."

Dr. Stander reacted unreasonably when Stakey asked an innocent question about the name of a pain medication. But that does not change the fact that Dr. Stander at least attempted to find alternative pain medications for Stakey. As such, Dr. Stander was not deliberately indifferent to Stakey's serious medical needs.

Stakey also complains that Dr. Stander called him a "junkie," and wrongly accused

him of improperly seeking narcotic pain medication.  But refusing to provide narcotic

pain medication to a patients without a history of drug abuse does not necessarily reflect

deliberate indifference, as Stakey suggests. Rather, Stakey and Dr. Stander disagreed as to

the appropriate pain medication. A difference in opinion will not support a finding of

deliberate indifference.

### B. Entity Liability

To find CMS liable under § 1983, plaintiff must show that CMS (1) had a

"permanent and well settled" policy that posed a substantial risk of serious harm to

Stakey, and (2) knew that its policy posed this risk. *Monell v. Dep't of Social Servs.*, 436

U.S. 658, 691 (1978); *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

Further, any such policy must have been the "moving force" behind any constitutional

violation Stakey suffered. *Monell*, 436 U.S. at 691-94.

Determining CMS' liability is somewhat difficult because the factual record tells

two competing stories. On the one hand, it cannot be denied that Stakey received

treatment for his injuries. During the twenty-one months between Stakey's first shoulder

injury and the date he filed his complaint, Stakey was seen eleven times – just for his

shoulder injury – by a physician, a physician's assistant, or a nurse. His shoulder was x-

rayed three times. He received pain medications, two kenalog injections, an arm sling,

and lower bunk memos on occasion. The medical records also reveal a fair number of

medical appointment for other issues.

On the other hand, the record reveals delays in treating Stakey's shoulder that caused him to remain in pain unnecessarily. The pattern, at least at times, seemed to be that Stakey would submit a medical kite that would get lost or otherwise fail to be addressed. He would then fill out offender concern forms at the prison, which would eventually prompt a doctor visit, or a prescription delivery.[5]

Ultimately, however, the Court cannot conclude that there is a sufficient pattern of delay to show that CMS has a "permanent" or "well settled" policy of providing deliberately indifferent medical care. Most significantly, despite the delays, there were times when Stakey was promptly treated. For example, when Stakey injured his shoulder in November 2008, he was seen within an hour by a nurse, and less than 24 hours later by a doctor. Although these providers did not deliver the urgent care Stakey wanted – to be taken to an emergency room – the treatment he received was by no means deliberately indifferent. *Cf. Smrz v. Correctional Medical Servs., Inc.*, 2009 WL 2591678, at *5 (D. Idaho Aug. 20, 2009) ("CMS's alleged negligence scheduling non-emergency surgery for three months later does not establish . . . 'deliberate indifference.'").

Relatedly, Stakey's argument that CMS sought to cut costs does not preclude

---

[5] Stakey has submitted the affidavit of Jason Heinze, presumably in an effort to support a policy argument. Heinze states that he had a similar injury as Mr. Stakey, and that he suffered for two years before he was allowed to see an orthopedist. *See Heinze Aff.*, Dkt. 73-3. Heinz's affidavit does not provide enough detail, however, to support a policy argument. Among other things, Heinze does not indicate where he was incarcerated. And even assuming he was incarcerated in one of the prisons where Stakey was housed, the affidavit does not provide sufficient detail regarding his injury or its treatment to conclude that the two-year delay was improper, or that Heinze was otherwise denied adequate medical treatment.

summary judgment. Even assuming CMS does seek to minimize costs, the treatment Stakey did receive does not reflect deliberate indifference. *Cf. Goodrick v. French*, 2011 WL 675265, at *7 (D. Idaho. Feb. 17, 2011) ("Even assuming that CMS seeks to cut costs and maximize profit where it can – much like most insurance companies in the health care industry in the outside world – the Court finds nothing in the current factual record to show that CMS's policies . . . have resulted in deliberate indifference . . . .").

In sum, Stakey did not receive flawless medical care. But the care CMS administered did not violate his right to remain free from cruel and unusual punishment.

### 3. Supervisory Liability of Wardens Blades, Hardison, and J. Smith

Defendants Randy Blades, John Hardison, and Johanna Smith joined CMS Defendants' Motion for Summary Judgment. *See Joinder*, Dkt. 71. Stakey alleges these defendants are or were wardens of prisons where he was housed. *Compl.* ¶¶ 17-18.

This Court previously dismissed Stakey's § 1983 damages action against these defendants in their official capacity, but allowed Stakey to pursue them individually. *See Order*, Dkt. 24, at 2. The Court also allowed Stakey to pursue his injunctive relief claims against defendants Blades and Smith. *Id.* at 3; *see also Initial Review Order*, Dkt. 8, at 8.

Turning first to the injunctive relief claim, defendants Blades and Smith are entitled to summary judgment because Stakey no longer in prison. He is currently living at a half-way house. *See Stakey's Letter to the Court*, Dkt. 82, at 1 (Stakey informs the Court of his July 11, 2011 release from IDOC). In general, a prisoner's transfer or release

will moot personal claims for injunctive relief because the prisoner is no longer subject to the allegedly unconstitutional policy. *See e.g., Preiser v. Newkirk*, 422 U.S. 395, 402-03 (1975).

As to Stakey's § 1983 claim, he contends that the wardens are the supervisory personnel responsible for promulgating policies affecting the medical care of inmates. However, because the undisputed facts show that Stakey's § 1983 action fails as to the individual defendants, his supervisory § 1983 action necessarily fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Long v. City & County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007).

**4.    Stakey's Negligence Claim**

In earlier orders, this Court allowed Stakey to pursue negligence claims against Blades, Hardison, J. Smith and all CMS Defendants. *See Initial Review* Order, Dkt. 8, at 9-10; *Order,* Dkt. 12, at 2.

Given the ruling on Stakey's § 1983 action, there are no federal claims remaining in this action and dismissal of Stakey's state law negligence claims is within the Court's discretion. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). The Supreme Court has cautioned that "if the federal claim are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966).

The Court will decline to exercise jurisdiction over Stakey's negligence claims. The state court is in a better position to rule on the negligence claims in this case, particularly as not all of defendants have briefed the negligence issue on summary judgment. The warden defendants (Blades, Hardison, and J. Smith) did not submit any brief at all, other than their one-paragraph joinder to the CMS Defendants' motion. And CMS itself (as opposed to the non-entity, individual CMS defendants) did not request summary judgment on the negligence claim. CMS apparently believed Stakey was not suing it for negligence, although this Court previously ordered that Stakey "shall be allowed to proceed against CMS on his § 1983 and state law negligence claims." *Order,* Dkt. 12, at 2.)

This Court will dismiss the negligence claims without prejudice to Stakey re-filing them in state court. This Court expresses no opinion on the merits of these claims.

**IT IS ORDERED:**

1.      The CMS Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. The Court grants summary judgment as to Stakey's federal claims against all CMS Defendants and against defendants Blades, Hardison, and J. Smith. The Court DENIES these defendants' request for summary judgment of Stakey's negligence claims.

2.      Stakey's negligence claims are dismissed without prejudice for lack of jurisdiction. Stakey may re-file these claims in state court. Pursuant to 28

U.S.C. § 1367(d), any applicable statutes of limitations on Stakey's state law negligence claims were tolled while this action was pending, and for an additional 30 days after this order of dismissal. Therefore, if Stakey wishes to continue tolling the statute of limitations on his negligence claims, he must re-file those claims in state court within 30 days of this order, unless state law provides for a longer time.

DATED:  **September 26, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge